UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X

**THIS DOCUMENT RELATES TO:**

Franchesca Romero, an individual,
Nick Killacky, an individual,                    CASE NUMBER:   1: 22-CV-06564 (LDH)(RML)
JessyKa Klenk, an individual,
David LaHaye, an individual,
Moshe Landis, an individual,                     **COMPLAINT**
Westley Lane, an individual,                     **AND DEMAND**
Meg Lauritsen, an individual,                    **FOR JURY TRIAL**
Megan Lee, an individual,
Thomas Madden, an individual,
Daniel Marranzini, an individual,
John Marshall, an individual,
Alyssa Mastrocola, an individual,
Randall McCracken, an individual,
Korbin McCray, an individual,
Kent McLane, an individual,


Plaintiffs,

        -against-


JUUL LABS, INC., A California Corporation;
JAMES MONSEES, An Individual;
ADAM BOWEN, An Individual;
NICHOLAS PRITZKER, An Individual;
HOYOUNG HUH, an Individual;
RIAZ VALANI, An Individual;
ALTRIA GROUP, INC., A Virginia Corporation;
ALTRIA CLIENT SERVICES, LLC, A Virginia Limited Liability Company;
ALTRIA GROUP DISTRIBUTION COMPANY, a Virginia Corporation;
ALTRIA ENTERPRISES, LLC, a Virginia Limited Liability Company;
PHILIP MORRIS USA, INC., a Virginia Corporation, and
DOES 1 through 100, inclusive,


                Defendants.
------------------------------------------------------------------------------X

1

Plaintiff Franchesca Romero , Nick Killacky, JessyKa Klenk, David LaHaye, Moshe Landis, Westley Lane, Meg Lauritsen, Megan Lee, Thomas Madden, Daniel Marranzini, John Marshall, Alyssa Mastrocola, Randall McCracken, Korbin McCray, and Kent McLane (hereinafter collectively referred to as "Plaintiffs") by and through their undersigned counsel, bring this complaint against Defendants JUUL Labs, Inc., previously d/b/a as PAX Labs, Inc. and PLOOM Inc. ("JLI"); ALTRIA Group, Inc.; Philip Morris USA, Inc.; Altria Client Services LLC; Altria Group Distribution Company; Altria Enterprises LLC; ALTRIA Group, Inc.; Adam Bowen; James Monsees; Nicholas Pritzker; Hoyoung Huh; Riaz Valani; and DOES 1-100 inclusive, and allege as follows:

## PARTIES

1.      Plaintiff Franchesca Romero is a citizen of Vestal, New York.

2.      Plaintiff Nick Killacky is a citizen of Gainesville, Florida.

3.      Plaintiff JessyKa Klenk is a citizen of Port Orange, Florida.

4.      Plaintiff David LaHaye is a citizen of Lebanon, New Hampshire.

5.      Plaintiff Moshe Landis is a citizen of University Heights, Ohio.

6.      Plaintiff Westley Lane is a citizen of Port Saint Lucie, Florida.

7.      Plaintiff Meg Lauritsen is a citizen of Limington, Maine.

8.      Plaintiff Megan Lee is a citizen of Hernando, Florida.

9.      Plaintiff Thomas Madden is a citizen of Kennebunk, Maine.

10.     Plaintiff Daniel Marranzini is a citizen of Wayne, New Jersey.

11.     Plaintiff John Marshall is a citizen of Boone, North Carolina.

12.     Plaintiff Alyssa Mastrocola is a citizen of Porter, Maine.

13.     Plaintiff Randall McCracken is a citizen of Seligman, Missouri.

14.     Plaintiff Korbin McCray is a citizen of Saint Joseph, Missouri.

15.     Plaintiff Kent McLane is a citizen of Sarasota, Florida.

16.     Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation. Its principal place of business is in San Francisco, California.  JLI's Registered Agent is CT Corporation System, 818 West Seventh St., Ste. 930, Los Angeles, California 90017.

17.    On information and belief, Defendant JAMES MONSEES ("MONSEES") is an individual who is a resident of San Francisco, California. MONSEES co-founded JLI (then named Ploom, Inc.) with Defendant Adam Bowen in or about 2007. MONSEES previously served as the Chief Executive Officer for JLI (as Ploom, Inc. and later, as Pax Labs, Inc.), served more recently as Chief Product Officer for JLI until approximately 2019, and was an advisor and member of the Board of Directors of JLI until his resignation in March of 2020. MONSEES is estimated to own a 1.75% stake in JLI. MONSEES continues to maintain an ownership of JLI despite stepping down from his official positions within the organization.

18.    On information and belief, Defendant ADAM BOWEN ("BOWEN") is an individual who is a resident of San Francisco, California. BOWEN co-founded JLI (then named Ploom, Inc.) with MONSEES in or about 2007. BOWEN has served as the Chief Technology Officer for JLI since its inception, and as a member of the Board of Directors. He also served as Chairman in 2019 until approximately July 2020. BOWEN is estimated to own a 1.75% stake in JLI.

19.    On information and belief, Defendant NICHOLAS PRITZKER ("PRITZKER") is an individual who is a resident of San Francisco, CA. PRITZKER was an early investor in JLI and has been a member of the JLI Board of Directors for many years. PRITZKER's family has a long history in the tobacco industry as the former owners of Conwood, which manufactured chewing tobacco. Conwood was sold to R.J. Reynolds, the second largest tobacco company in the United States.

20.    On information and belief, Defendant HOYOUNG HUH ("HUH") is an individual who is a resident of the San Francisco Bay Area, in Northern California. HUH has been a member of the JLI Board of Directors since 2015.

21.    On information and belief, Defendant RIAZ VALANI ("VALANI") is an individual who is a resident of Santa Clara County, in Northern California. VALANI has been on JLI's Board of Directors since 2011.

22.    MONSEES, BOWEN, PRITZKER, VALANI, and HUH are collectively referred to as JLI MANAGEMENT. At all relevant times, JLI MANAGEMENT authorized, directed, participated in, and/or were involved in all key decisions, actions, and omissions of JLI involving the design, manufacture, inspection, testing (or not), packaging, labeling, marketing, advertising, promoting, distribution, and/or sale

of JUUL products, and all decisions, actions, and omissions stated herein, except as otherwise expressly provided. ADAM BOWEN, JAMES MONSEES, NICHOLAS PRITZKER, HOYOUNG HUH, RIAZ VALANI (together with JLI, "JLI DEFENDANTS"), targeted advertising and manipulation of nicotine delivery has contributed to a public health crisis that has left thousands of individuals—many of them teenagers—addicted to its products and beset with significant health consequences.

23.     On information and belief, Defendants ALTRIA GROUP INC., ALTRIA CLIENT SERVICES, LLC, ALTRIA GROUP DISTRIBUTION COMPANY, and ALTRIA ENTERPRISES LLC (collectively referred to as "ALTRIA") are Virginia entities with their principal place of business in Richmond, Virginia.

24.     On information and belief, ALTRIA GROUP, INC. purchased a 35% stake in JLI on December 20, 2018. ALTRIA GROUP, INC. transferred its interest in JLI to ALTRIA ENTERPRISES LLC. ALTRIA GROUP DISTRIBUTION COMPANY provides sales, distribution and consumer engagement services to Altria's tobacco companies, including JLI. ALTRIA CLIENT SERVICES, LLC provides Altria Group and its tobacco companies, including JLI, with assistance in advanced analytics, compliance, consumer and market insights, government affairs, regulatory affairs, safety and health, among other areas.

25.     Defendant PHILIP MORRIS USA, INC., is a Virginia Company with its principal place of business in Richmond, Virginia, and is registered to do business in California. PHILLIP MORRIS USA, INC. (included in the collective reference to "ALTRIA") is a wholly owned subsidiary of ALTRIA GROUP, INC. On information and belief, PHILIP MORRIS USA, INC., guaranteed the loan ALTRIA used to purchase JLI.

26.     While Plaintiffs have attempted to identify the specific Altria defendant which undertook certain acts alleged in this Complaint, they were not always able to do so due to ambiguities in Altria's and JLI's own documents. References in these internal documents to "Altria" without further detail are common. In other words, Defendants do not always specify which entity is involved in particular activities in their own internal documentation. Moreover, key employees moved freely between Altria Group, Inc. and its various operating subsidiaries, including defendants Altria Client Services, Altria Group Distribution

Company, and Philip Morris USA Inc – each of which is a wholly owned subsidiary of Altria Group, Inc. For example, K.C. Crosthwaite (who would later become CEO of JLI) was at various points from 2017 through 2019 employed by Altria Client Services, Philip Morris, and Altria Group. And in its own annual reports to Shareholders, when identifying the "Executive Officers" of Altria Group, Altria states that the "officers have been employed by Altria *or its subsidiaries* in various capacities during the past five years."

27.     Notably, Altria Group directs the activities of its varying operating companies, including defendants Altria Client Services, Altria Group Distribution Company, and Philip Morris. For this reason, and unless otherwise specified, the term "Altria" refers to Altria Group Inc. as the responsible entity, by virtue of its control over its various operating subsidiaries. To the extent such an assumption is incorrect, the knowledge of which Altria Group Inc. subsidiary is responsible for specific conduct is knowledge solely within the possession of the Altria Defendants.

28.     Upon information and belief, the ALTRIA DEFENDANTS conducted meetings, interviews and inspections at the JLI facilities in San Francisco and engaged in frequent communications regarding JUUL with JLI in California, in the State of New York, and elsewhere prior to, during and subsequent to its stock purchase.

29.     JLI and the ALTRIA DEFENDANTS are referred to jointly in the causes of action below as "DEFENDANTS".

30.     JLI and JLI MANAGEMENT and ALTRIA conspired and engaged in the following unlawful acts as alleged throughout the complaint.

31.     JLI, JLI MANAGEMENT, and ALTRIA and/or their predecessors in interest knowingly agreed, contrived, combined, confederated and conspired among themselves, in the State of California and in the State of New York, to cause injuries and/or illnesses by exposing Plaintiffs to dangerous products, JUUL products. JLI, JLI MANAGEMENT, and ALTRIA, knowingly agreed, contrived, confederated and conspired to deprive Plaintiffs of the opportunity of informed free choice as to whether to use JUUL Products or expose themselves to the dangers associated with them. JLI, JLI MANAGEMENT, and ALTRIA committed the above and below described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of JUUL Products.

32.     In furtherance of said conspiracies, JLI, JLI MANAGEMENT, and ALTRIA have been in possession of medical and scientific literature and test reports which clearly indicated that ordinary and foreseeable use of JUUL Products is unreasonably dangerous, hazardous and deleterious to human health, and potentially deadly.

33.     In furtherance of said conspiracies, the JLI, JLI MANAGEMENT, and ALTRIA, despite the medical and scientific data, literature and test reports possessed by them and available to them, individually, jointly and in conspiracy with each other, wrongfully, fraudulently, willfully, and malicious agreed among themselves to withhold, conceal and suppress medical information regarding the risk associated with JUUL Products.

34.     JLI, JLI MANAGEMENT, and ALTRIA participated in a common plan to commit the torts alleged herein, and each acted tortiously in pursuance of the common plan to protect and promote the health and safety of JUUL use, to the known detriment of the public, including Plaintiffs.

35.     Plaintiffs reasonably and in good faith relied upon false representations, omissions and concealments made by JLI, JLI MANAGEMENT, and ALTRIA regarding the nature of the JUUL Products and as a result suffered the injuries and damages alleged herein.

36.     JLI, JLI MANAGEMENT, and ALTRIA conspired and entered into the aforementioned agreements in the State of California, aided and abetted each other, engaged in the aforementioned acts in furtherance of their conspiracy, joint venture and agreements together with each other in California, and as a result of the foregoing conduct in furtherance of their conspiracy, joint venture and agreements, and aiding and abetting each other, each of them is derivatively liable for the conduct of the others in California and in New York.

37.     Plaintiffs are informed and believes, and upon such information and belief alleges, that each of the Defendants designated as a Doe is legally responsible in some manner for the events and happenings hereinafter referred to and caused damages thereby as hereinafter alleged.  Plaintiffs will seek leave of the Court to amend this complaint to show the true names and capacities of the Defendants, and each of them, designated as Does, when the same have been ascertained. At all times relevant to this action Defendants and Does 1 through 100, inclusive, and each of them, were the agents, servants, alter ego, employees, joint

venturers, and abettors of each other and at all times herein mentioned each and all were acting within the course, scope and purpose of their respective agency, service, employment and joint venture relationships.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiffs reside.

## ALLEGATIONS

39.     The following allegations are pled on information and belief based on investigation conducted to date.

40.     In or about 2010, MONSEES and BOWEN developed their first vaping device, the Ploom. In 2012, MONSEES and BOWEN developed their next line of vaporizers, PAX. PAX was popular with marijuana smokers and had little success on the tobacco market. MONSEES and BOWEN set out to create a vaporizer that would compete with combustible cigarettes.

41.     MONSEES and BOWEN spent years reviewing historical documents from the tobacco industry, including their advertising, marketing, and research.

42.     MONSEES and BOWEN set out to create an e-cigarette with the buzz of a cigarette but without the harsh throat hit. Up to that point, e-cigarettes had been unable to deliver the hit of a combustible cigarette. Many, including MONSEES and BOWEN, felt that this was preventing e-cigarettes from gaining popularity among consumers.

7

43.     MONSEES and BOWEN would find their tobacco recipe in nicotine salts. Prior e-cigarettes, including those developed by MONSEES and BOWEN, used free base nicotine. Nicotine salts had the ability to deliver a high dose of nicotine but without the harsh throat hit.

44.     MONSEES and BOWEN found their key formula for nicotine salts in part through their review of the historical tobacco documents including, but not limited to, Project XGT conducted by R.J. Reynolds.

45.     MONSEES and BOWEN launched the JUUL device and pods in 2015. Almost immediately after launching the device it became clear that it was appealing to underage youth.

46.     Plaintiff is  informed and believes, and thereon alleges, that despite early warnings that the JUUL device was appealing to underage youth, JLI MANAGEMENT decided not to change course, and to instead encourage youth use of JUUL products. This was done primarily through social media campaigns featuring young models.

47.     Plaintiff is informed and believes, and thereon alleges that JLI MANAGEMENT personally directed and/or participated in the conduct of JLI described throughout this Complaint.

**JLI Falsely Advertises Its E-Cigarette System as "Safe"**

48.     JLI and JLI MANAGEMENT (collectively referred to as "JLI") failed to evaluate and warn about the dangers of its products, and it falsely advertises its e-cigarette system as a safe alternative to traditional cigarettes. JLI evaluated and knew or should have known the potential dangers of its products but failed to adequately ascertain and warn about those dangers.

49.     JLI is a pioneer in Electronic Nicotine Delivery Systems ("ENDS") and related technologies. ENDS are touted as a safe alternative to traditional combustible cigarettes.  JLI introduced its ENDS-branded, innovative commercial product to the United States market in 2015. JUUL products are available via retail locations in 150 countries and the JUUL online store.

50.     The JUUL system is comprised of two components: (i) a vaporizer device; and (ii) disposable pods that are prefilled with a proprietary mixture of vaporizer carriers, nicotine salt extracts, and flavoring (together, "e-liquid"). When a user inserts a pod into the device and inhales using the mouthpiece, the device rapidly heats the e-liquid, aerosolizing it to allow the user to inhale a puff of the vaporized e-

8

liquid. JLI owns and operates juullabs.com and juulvapor.com where it advertises and sells e-cigarettes and pods.

51.    JLI advertises its e-cigarettes and pods deliberately to attract minors and young adults, including those who have never even been regular tobacco smokers. In June of 2015, JLI launched the "Vaporized" advertising campaign. Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness, and being "cool." Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[1]

  



---

[1] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cigarette company,* Business Insider (Nov. 26, 2018, 6:07 am), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.

52.     The JUUL system delivers more potent doses of nicotine than traditional cigarettes. Under the guise of a safe alternative, JUUL thus exposes these nonregular-tobacco users to highly-addictive products. The flavored product coupled with the patented nicotine formulation creates a perfect storm for addiction among high schoolers, college students, and adults.  JLI makes it easy to purchase its products. The JUUL e-cigarettes and pods are available for purchase online. There is also a subscription service on JUUL's website. The JUUL system has been widely adopted and attained tremendous commercial success, currently holding over 70% of the e-cigarette market share. JUUL e-cigarettes are sleek, discrete, and easy to hide. The system looks like a USB flash drive and can even be charged using the USB port of a computer. On its face, JUUL does not appear to be a tobacco-related product. JLI sold pods in flavors that appeal to minors, as young as middle school, as well as high-school and college students. These flavors included mango, fruit medley, crème brûlée, cool mint, and cool cucumber.

53.     JLI even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL used imagery that looked like ads for a trendy coffee shop or restaurant.



54.    None of these of these advertisements prominently disclosed that JUUL was addictive, contained nicotine, and unsafe.

55.    Flavors play a key role in the use of tobacco products in teens and young adults. Numerous physician and health organizations have urged the FDA to act on this epidemic, citing the FDA's Population Assessment of Tobacco and Health (PATH) Study found that 85 percent of current e-cigarette users aged 12-17 had used flavored product in the past month and 81.5 percent of those young users cited flavors as the reason for their use of the product. JUUL e-cigarettes deliver nicotine more quickly, more effectively, and at higher doses than other e-cigarettes, increasing the users' risk of addiction. Each pod of e-liquid contains more nicotine than a pack of cigarettes.

56.    E-cigarettes were largely unregulated until May 10, 2016, when the Department of Health and Human Services, Food and Drug Administration, passed 21 C.F.R. Parts 1100, 1140, and 1143: "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statement for Tobacco Products." The FDA has allowed e-cigarettes that were already on the market as of August 8, 2016, to stay on the market until at least 2022 without filing applications or undergoing public health review by the FDA. The sale and market growth of JUUL e-cigarettes and pods has thus occurred without any regulatory oversight into the health risks of the vaporization of nicotine salts. On April 24, 2018, however, the FDA requested that JLI submit to the FDA

documents relating to market practices and research on marketing, effect of product design, public health impact, and adverse experiences and complaints related to JUUL products.

**JLI Enlists the Help of Altria to Reach Youth Market**

57.    JLI, including but not limited to JLI MANAGEMENT, sought to increase their share of the e-cigarette market. JLI MANAGEMENT sought to do this by increasing their sales to underage youth. In order to do this, JLI MANAGEMENT enlisted the help of tobacco giant, ALTRIA.

58.    ALTRIA'S efforts to launch their own e-cigarette had been largely unsuccessful. By early 2017, JLI represented a strong ally and a way into the highly successful e-cigarette market.

59.    ALTRIA'S CEO Howard Willard, first contacted JLI and JLI MANAGEMENT in early 2017.

60.    For at least 18 months prior to ALTRIA'S purchase of a 35% stake in JLI, ALTRIA and JLI began working together in order to expand JLI's customer base, largely through recruiting underage JUUL users. JLI MANAGEMENT was critical to this process.

61.    In 2017, ALTRIA began securing top shelf space from various e-cigarette retailers, spending in excess of $100 million. ALTRIA's own e-cigarette, MarkTen, had limited success and did not justify such a large investment.

62.    ALTRIA took these steps in anticipation of its purchase of JLI. In fact, once ALTRIA invested in JLI, JUUL products received the prominent placement previously secured by ALTRIA'S investments.

63.    JLI also benefited from ALTRIA'S industry connections. JUUL became more widely distributed starting in 2017. This was due to ALTRIA'S influence in the tobacco industry, including influence over retailers and distributors.

64.    On December 20, 2018, ALTRIA purchased a 35% stake in JLI. JLI MANGEMENT received millions in bonuses. JLI employees, including JLI MANAGEMENT, received $2 billion in bonuses which was split among JLI'S 1,500 employees. JLI MANAGEMENT took millions, and maybe even billions, out of JLI.

65.     JLI, JLI MANAGEMENT, and ALTRIA ("Defendants") worked together and conspired to: (1) increase JUUL'S usage; (2) recruit additional users, many of whom were underage; and (3) use false and deceptive social media campaigns including but not limited to the "make the switch" campaign which led consumers to believe JUUL was safer than combustible cigarettes.

66.     In December of 2018, when ALTRIA'S investment in JLI became formalized, a number of ALTRIA employees began moving over to JLI, including the research and development department and several high-level executives.

**JLI and ALTRIA Conspired to Defraud the Pubic and Conceal the Potential Risks of JUUL**

67.     Upon information and belief, JLI, JLI MANAGEMENT and ALTRIA knowingly agreed, contrived, combined, confederated and conspired among themselves to cause injuries, diseases and/or illnesses by exposing consumers and Plaintiffs to the harmful and dangerous JUUL e-cigarette and pods products.  JLI, JLI MANAGEMENT and ALTRIA knowingly agreed, contrived, confederated and conspired to deprive Plaintiffs of the opportunity of informed free choice as to whether to use the JUUL e-cigarette and pods products or to expose themselves to the dangers associated with them.  JLI, JLI MANAGEMENT and ALTRIA committed the above described wrongs by working in concert to maintain and expand the number of nicotine-addicted e-cigarette users to ensure a steady and growing customer base and willfully misrepresenting and suppressing the truths as to the risks and dangers associated with the use of JUUL e-cigarette and pods products.

68.     This was accomplished in part by: (1) creating a highly addictive product; (2) deceptive social media campaigns; and (3) defrauding the public, including Plaintiff, regarding the risks associated with JUUL use.

69.     Upon information and belief, in furtherance of said conspiracies, JLI, JLI MANAGEMENT and ALTRIA individually, jointly, and in conspiracy with each other, knew of the potential risks and dangers associated with the use of JUUL e-cigarette and pods and wrongfully, fraudulently, willfully and maliciously agreed among themselves to withhold, conceal and suppress the information that their products were associated with or could cause serious injuries. JLI, JLI MANAGEMENT and ALTRIA also conspired to conceal their knowledge that they had failed to fully test or study said risks.

13

70.     Upon information and belief, and in furtherance of said conspiracies, JLI, JLI MANAGEMENT and ALTRIA committed fraud by leading the public to believe that: (1) JUUL is a safe device; (2) that JUUL is safer than cigarettes; and (3) that JUUL is a smoking cessation device. These were among numerous other false statements that were perpetuated by JLI, JLI MANAGEMENT and ALTRIA.

71.     Upon information and belief, and in furtherance of said conspiracies, JLI, JLI MANAGEMENT and ALTRIA shared data and strategy to support their common purpose of defrauding the general public, including but not limited to Plaintiff.  ALTRIA ensured that JUUL products had access to prime shelf space in retail locations and used its industry connections to expand JUUL's distribution.

72.     Upon information and belief, individually and in concert with each other, JLI, JLI MANAGEMENT and ALTRIA participated in a common plan to commit the torts alleged herein, and each acted tortiously in pursuance of the common plan to expand the market and protect and promote the safety of JUUL e-cigarette and pod use, to the known detriment of the public, including Plaintiffs.

73.     Plaintiffs reasonably and in good faith relied upon false representations, omissions, and concealments made by JLI, JLI MANAGEMENT and ALTRIA regarding the nature of JUUL e-cigarettes and pods and as a result suffered the injuries and damages alleged herein.

74.     JLI, JLI MANAGEMENT and ALTRIA conspired and entered into the aforementioned agreements in the State of California, aided and abetted each other, and engaged in the aforementioned acts in furtherance of their conspiracy, joint venture and agreements together with each other in California, and as a result of the foregoing conduct in furtherance of their conspiracy, joint venture and agreements, and aiding and abetting each other, each of them is derivatively liable for the conduct of the others in California and in New York.

**Studies Highlight the Negative Health Effects of JUUL**

75.     The simple yet almost unfathomable reality is that, until recently, very little was known about the detrimental health effects that JUUL e-cigarettes and pods cause to the human lungs and body. In accordance with section 904(b) of the FD&C Act, the FDA requested that JLI "submit all documents relating to marketing practices and research activities and research findings, conducted, supported, or possessed by you or your agents relating to a specific set of topics...research may include, but is not limited

to, focus groups, surveys, experimental clinical studies, toxicological and biochemical assays, in vivo and in vitro assays including animal testing, laboratory formulation and processing testing, taste panels, and assessments of the effectiveness of product marketing practices." Modern science has thus been playing catch-up with the effects of e-cigarettes on humans. Since the science has developed, it has been found that JUUL is a wolf-in-sheep's-clothing, delivering as much or more nicotine and harmful chemicals as bigger, more conspicuous e-cigarettes.

76. Nicotine is both a stimulant and relaxant. Biochemically, it works by binding to receptors in multiple regions of the brain. It raises dopamine levels and can mimic key neurotransmitters that affect focus and arousal. The nicotine delivery for JUUL is enhanced by adding benzoic acid to nicotine salts, which occur naturally in tobacco, allowing for rapid nicotine delivery in vapor form that is quickly absorbed into the lungs and brain. When inhaled, the flavored vapor is pleasing to the palate and the nicotine produces a rush to the brain.

77. In March 2018, Dr. Johnathan Winickoff, the former chair of the American Academy of Pediatrics Tobacco Consortium, said that "JUUL is already a massive public-health disaster-and without dramatic action it's going to get much, much worse." Dr. Winickoff, who is also a pediatrician at Massachusetts General Hospital and Professor at Harvard Medical School also noted that: "[i]f you were to design your ideal nicotine-delivery device to addict a large numbers of United States kids, you'd invent JUUL." Of the emerging e-cigarettes, JUULs have all the necessary elements to take over a substantial portion of the market share. Its batteries can be recharged in an hour, it is flavored, it can often be used without detection, and it contains somewhere around twice the concentration of nicotine as other vape products. In 2019 the American vaporizer market grew to five and a half billion dollars, an increase of twenty-five percent from 2017. 70% of that market belongs to JUUL.

78. JUUL's e-liquid contains five ingredients: glycerol, propylene glycol, nicotine, benzoic acid, and food-grade flavoring. Glycerol is a sweet liquid that has been used in antifreeze and toothpaste. Propylene glycol is used in asthma nebulizers. Benzoic acid is a common food preservative. Vaporing these liquids at elevated temperatures may result in the generation of known pulmonary toxicants, including acrolein, acetaldehyde, and formaldehyde. Some of the chemicals in the flavoring have known adverse

respiratory effects. Marketed as a transitional product to help adult smokers stop smoking cigarettes, many physicians question whether the higher doses of nicotine delivered in a JUUL-vape draw just make the user want more. Nicotine affects young peoples' cognitive development, making them more susceptible to other addictions later in life. A Lancet study in March 2007 ranked nicotine as more addictive than alcohol or barbiturates. The National Academies recently published Public Health Consequences of E-Cigarettes, which shows incontrovertible evidence that using e-cigarettes creates dependence.

79.    The company's patented JUUL Salts approach to nicotine delivery is due to compounds called nicotine salts, which develop in heat-dried tobacco leaves. According to JUUL's website, freebase nicotine is mixed with benzoic acid to make the e-liquid, which has a chemical reaction that produces the nicotine salts. JLI U.S. Patent No. 9,215,895 covers its process to produce nicotine salts. The patented process allows 20% more nicotine to enter the blood stream than a Pall Mall cigarette, rendering the risk of addiction and abuse higher for JUUL users versus those who use traditional cigarettes.

80.    JLI heavily promotes its products via social-media platforms. It presents the products as trendy, fresh, and safer alternatives to cigarettes, thus minimizing the health risks and addictiveness of "juuling." This advertising mirrors how the tobacco industry promoted cigarettes as being cool while suppressing the long-term adverse health complications. Research conducted by the University of Kansas has shown that young people fail to question the information touted in the e-cigarette ads, that the ads make them believe that they would not get addicted to e-cigarettes based on the information portrayed in the ads, and that the emotional appeal of the ads make adolescents perceive social benefits like increased friendships.






81.    Recent studies examining the effects of e-cigarettes on the lungs have highlighted the dangers of vaping. A study from the Marsico Lung Institute and the Department of Pathology at the University of North Carolina-Chapel Hill shows that vaping from e-cigarettes causes a unique innate immune response in the lung, involving increased neutrophilic activation and altered mucin secretion. The authors wrote "taken together, our results indicate that the effects of e-cigarettes are both overlapping with and distinct from what is observed in otherwise healthy cigarette smokers. In conclusion, our results challenge the concept that e-cigarettes are a healthier alternative to cigarettes and reverse smoking-induced adverse health effects." Reidel et al, E-Cigarette Use Causes a Unique Innate Immune Response in the Lung, Involving Increased Neutrophilic Activation and Altered Mucin Secretion, AM J RESPIR CRIT CARE MED (2018 Feb 15;197(4):492-501).

82.     Another study by Dr. Casey G. Sommerfield MD with the Children's Hospital of Pittsburgh of UPMC reported the first case of hypersensitivity pneumonitis and acute respiratory distress syndrome as a risk of e-cigarette use in an adolescent. Dr. Sommerfield's case report involves an 18-year-old woman who presented with severe inflammatory disease of the lung called hypersensitivity pneumonitis. In an acute setting, hypersensitivity pneumonitis may be secondary to chemical exposure, which is found in e-cigarette vapor. The case report thus shows a life-threatening risk of e-cigarette use in an adolescent patient. Another study from the Comprehensive Cancer Center at the Ohio State University found that the induction of inflammation by e-cigs may differentially impact lung cancer and chronic obstructive pulmonary disease (COPD) risks and that the role of nicotine also needs to be considered, as it had both pro-and-anti-inflammatory potential, making it unclear how nicotine content may mediate the effects of the other aerosol constituents. Shields et al, A Review of Pulmonary Toxicity of Electronic Cigarettes in the Context of Smoking: A focus on Inflammation, CANCER EPIDEMIOL BIOMARKERS PREV 2017 Aug;26(8):1175-1191.

83.     Studies conducted at Tulane University show that e-cigarette aerosol is capable of inducing reactive oxygen species, DNA damage, and cell death in human umbilical vein endothelial cells and that in vivo studies of e-cigarette aerosol's effect on the cardiovascular system have shown broad spectrum of potentially negative effects. Anderson et al, E-Cigarette Aerosol Exposure Induces Reactive Oxygen Species, DNA Damage, and Cell Death in Vascular Endothelial Cells, TOXICOLOGICAL SCIENCES 154(2), 2016 332-340.

84.     A study funded by the National Institutes of Health, published in the Proceedings of the National Academy of Sciences on October 7, 2019, tested the effect of vaped nicotine on mice. After breathing in vapor for 20 hours a week for more than a year, 22.5% of the mice had cancerous tumors in the lining of the lungs, and 57.5% developed growths in their bladder tissue that can be precursors to cancer. The researchers also found that a few of the mice exposed to e-cigarette vapor – with or without nicotine – developed abdominal or skin tumors, while none of the counterparts in the control group did. Tang, et al., Electronic-cigarette smoke induces lung adenocarcinoma and bladder urothelial hyperplasia in mice, PNAS, 2019 October 7.

85.     Researchers at the Mayo Clinic studied the samples of lung tissue from seventeen patients around the country who were being treated for vaping related illnesses. In an October 2019 study, the researchers opined that they observed immune cells with "the fine, foamy-looking appearance that is characteristic of chemical injuries." The researchers found that patients with lung illnesses from vaping had tissue damage and cell death in the lining of the airways and in the lungs themselves. As the body of the patient reacts and tries to heal, the tissue swells and can narrow the airways. Dead cells slough off into the airways, blocking them further, and fluids leak in the lungs' air sacs. The swelling, tissue damage and fluid buildup make it impossible for the patient to breathe. The researchers found that it is too soon to tell whether the survivors' lungs would fully recover and whether vaping would lead to lifelong, chronic respiratory problems. Butt UM, Smith ML, Tazelaar HD, et al. Pathology of vaping-associated lung injury, N Eng J Med. DOI: 10.1056/NEJMc1913069, 2019 October 2.

86.     JLI, with the help of ALTRIA and its industry knowledge, has been incredibly successful through its advertising, inducing young people, including middle, high school and college students, to start vaping. It has done so with wholly inadequate warnings about the potential health hazards of using the JUUL e-cigarettes and pods. Medical evidence shows significant health issues relating to the transmission of glycerol, propylene glycol, nicotine, benzoic acid, and food-grade flavoring in the vapor itself. The cytotoxic properties of these vaporized chemicals cause cellular damage to pulmonary and vascular cells that is acute and may lead to hypersensitivity pneumonitis and restrictive airway disease. There is growing scientific concern among public-health officials that vaping may cause a much higher rate of COPD in young adults and that vaping may evolve into a national health epidemic because it has become a means to nicotine addiction, rather than an end. Vaping among young people is surpassing all other forms of tobacco use.

87.     There is a subset of adults who use JUUL e-cigarettes and who will develop significant acute pulmonary inflammation, leading to pneumonitis and pneumonia that will require medical intervention, including hospitalization and potentially mechanical ventilation. There is another subset of JUUL users who will sustain varying degrees of pulmonary injury that, over time, may cause shortness of breath, dyspnea, restrictive airway disease, and COPD. Modern pulmonary medicine allows physicians to assess and

19

measure the level of pulmonary injury regarding both restrictive airway disease and inflammatory changes through advanced non-invasive pulmonary function tests and bronchoscopy. Past and current JUUL users who have exposed and continue to expose their pulmonary and cardiovascular systems to vapor will need medical monitoring to assess how badly the vaping has affected them. Restrictive airway disease is often permanent and JUUL users will need to know how continued use may permanently impair their health and restrict their mobility. The evidence shows that newer smokers who use JUUL will have increased risks of cancer from the carcinogenic compounds found in the vapor.

88.     The FDA Commissioner has also announced a potential link between seizure and e-cigarette use.  See U.S. Food and Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's ongoing scientific investigation of potential safety issue related to seizures reported following e-cigarette use, particularly in youth and young adults; April 3, 2019, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

**Plaintiffs' JUUL Addiction Leads to Injuries and Requires Medical Treatment**

89.     Plaintiff Franchesca Romero began using JUUL as a young adult and has sustained serious injuries from her JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

90.     Plaintiff Nick Killacky began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

91.    Plaintiff JessyKa Klenk began using JUUL as a young adult and has sustained serious injuries from her JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

92.    Plaintiff David LaHaye began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

93.    Plaintiff Moshe Landis began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

94.    Plaintiff Westley Lane began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

95.    Plaintiff Meg Lauritsen began using JUUL as a young adult and has sustained serious injuries from her JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong

treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

96. Plaintiff Megan Lee began using JUUL as a young adult and has sustained serious injuries from her JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

97. Plaintiff Thomas Madden began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

98. Plaintiff Daniel Marranzini began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

99. Plaintiff John Marshall began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

100.    Plaintiff Alyssa Mastrocola began using JUUL as a young adult and has sustained serious injuries from her JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

101.    Plaintiff Randall McCracken began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

102.    Plaintiff Korbin McCray began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

103.    Plaintiff Kent McLane began using JUUL as a young adult and has sustained serious injuries from his JUUL usage, including *inter alia* nicotine addiction, as well as other severe and personal injuries which are lasting in nature, including diminished enjoyment of life, as well as the need for lifelong treatment for addiction, monitoring, and/or medications, and fear of developing other health consequences. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of JUUL.

104.    Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that their products were associated with or could cause serious injuries. In the alternative, Defendants concealed their knowledge that they had failed to fully test or study said risks.

23

105.    JLI's failure to disclose in its advertising information that it possessed regarding the failure to adequately test and study its product(s) for serious health risks further rendered the advertising for this product inadequate.

106.    Defendants failed to disclose a known defect and affirmatively misrepresented that JUUL e-cigarettes and pods were safe for their intended use in their advertising.  Further, in their advertising, Defendants actively concealed the true risks associated with the use of JUUL e-cigarettes and pods. Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of Defendants' concealment of and misrepresentations regarding the true risks associated with JUUL e-cigarettes and pods, Plaintiffs could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

107.    Defendants' failure to warn was willful and malicious in that the conduct was carried on with a conscious disregard for the safety and the rights of the Plaintiffs.  Plaintiffs have suffered and will continue to suffer from physical injuries and the continuing likelihood of medical problems as described herein.

108.    By reason of the foregoing acts and omissions, Plaintiffs have endured and continue to suffer severe personal injuries, including medical expenses, physical pain and mental anguish, diminished enjoyment of life, and loss of earnings, among other damages.

<u>**FIRST CAUSE OF ACTION**</u>

**Strict Products Liability - Design Defect**

**(Against JLI DEFENDANTS and ALTRIA and DOES 1 through 100)**

109.    Plaintiffs incorporate the above and below allegations by reference.

110.    At all relevant times, JLI DEFENDANTS and DOES 1 through 100, manufactured, distributed, and/or sold the JUUL Devices and Pods ("JUUL Products") that Plaintiffs consumed.

111.    At all relevant times, ALTRIA played an integral role in the producing and marketing enterprise of JUUL, a defective product, and received profit from placing the product into the stream of commerce. ALTRIA's actions include but are not limited to securing of shelf space for JUUL, interactions

with the FDA on JUUL's behalf, providing access to ALTRIA'S marketing and distribution network for purposes of promoting JUUL Products.

112. ALTRIA'S involvement was integral to creating a consumer demand and reliance upon JUUL, including but not limited to, youth usage of JUUL Products.

113. ALTRIA had a substantial ability to influence the manufacturing and/ or distribution process.

114. JUUL Products were defective in design in that they did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way. The product's failure to perform safely was a substantial factor in causing the harm to Plaintiffs.

115. Alternatively, the products' design was defective because the risks inherent in the design of the JUUL Products outweighed the benefits and the JUUL Products were a substantial factor in causing the harm to Plaintiffs.

116. The product was expected to and did in fact reach Plaintiffs, and was thereafter used without substantial change in its condition in which it was sold.

117. As a result of JLI DEFENDANTS, ALTRIA, and DOES 1 through 100's conduct, PLAINTIFFS suffered severe injuries.

118. The defect(s) in JUUL Products was a substantial factor in causing the harms and losses that PLAINTIFFS have suffered.

119. As a result of their injuries caused by JLI DEFENDANTS, ALTRIA and DOES 1 through 100, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

120. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS, ALTRIA and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Strict Products Liability - Failure to Warn

### (Against JLI DEFENDANTS, ALTRIA and DOES 1-100)

121. Plaintiffs incorporate the above and below allegations by reference.

122. At all relevant times, JLI DEFENDANTS named herein designed, manufactured, distributed, sold assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiffs consumed.

123. At all relevant times, ALTRIA played an integral role in the producing and marketing enterprise of JUUL, a defective product, and received profit from placing the product into the stream of commerce. ALTRIA's actions include but are not limited to securing of shelf space for JUUL, interactions with the FDA on JUUL's behalf, providing access to ALTRIA'S marketing and distribution network for purposes of promoting JUUL Products.

124. ALTRIA'S involvement was integral to creating a consumer demand and reliance upon JUUL, including but not limited to, youth usage of JUUL Products.

125. ALTRIA had a substantial ability to influence the manufacturing and/ or distribution process.

126. The JUUL Products that Plaintiffs consumed had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture, distribution, or sale.

127. The potential risks presented a substantial danger when the JUUL Products were used or misused in an intended or reasonably foreseeable way.

128. The ordinary consumer of JUUL Products would not have recognized the potential for risks.

129. JLI DEFENDANTS, ALTRIA and DOES 1 through 100 failed to adequately warn or instruct of the potential risks, including but not limited to: that the products are not safe for anyone under 26 years old, may cause strokes, heart attacks and other cardiovascular injuries, seizures and other neurological injuries, lung collapse and other pulmonary injuries, are powerfully addictive, may cause permanent brain changes and mood disorders, may impair learning and cognition.  Instead, as described

herein, JLI DEFENDANTS, ALTRIA and DOES 1 through 20made their products available in youth-friendly colors and flavors. JLI DEFENDANTS, ALTRIA and DOES 1 through 100 also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability, and increased the level of nicotine that is absorbed by users, making them even more addictive and dangerous.

130. The product was expected to and did in fact reach Plaintiffs, and was thereafter used without substantial change in its condition in which it was sold.

131. As a result of JLI DEFENDANTS', ALTRIA, and DOES 1-100 failures to adequately warn and/or instruct, Plaintiffs were harmed as described herein.

132. The lack of sufficient instructions and warnings was a substantial factor in causing Plaintiffs' harm and losses.

133. As a result of their injuries caused by JLI DEFENDANTS', ALTRIA, and DOES 1-100, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

134. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS, ALTRIA and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Negligence and/or Gross Negligence

### (Against JLI DEFENDANTS, ALTRIA, and DOES 1 - 100)

135. Plaintiffs incorporate the above and below allegations by reference.

136. JLI DEFENDANTS, in concert with and aided by ALTRIA and DOES 1 through 100 designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

137. At all relevant times, ALTRIA played an integral role in the producing and marketing enterprise of JUUL, a defective product, and received profit from placing the product into the stream of

commerce. ALTRIA's actions include but are not limited to securing of shelf space for JUUL, interactions with the FDA on JUUL's behalf, providing access to ALTRIA'S marketing and distribution network for purposes of promoting JUUL Products.

138.   ALTRIA'S involvement was integral to creating a consumer demand and reliance upon JUUL, including but not limited to, youth usage of JUUL Products.

139.   ALTRIA had a substantial ability to influence the manufacturing and/ or distribution process.

140.   JUUL Products were the types of products that could endanger others if negligently made or promoted. JLI DEFENDANTS, ALTRIA, and DOES 1 through 100 knew or should have known that JUUL Products were dangerous or were likely to be dangerous when used or misused in a reasonably foreseeable manner.

141.   JLI DEFENDANTS, ALTRIA, and Does 1 through 100 knew or should have known that ordinary users would not realize the danger.

142.   JLI DEFENDANTS, ALTRIA and Does 1 through 100 failed to adequately warn of the danger.

143.   JLI DEFENDANTS, ALTRIA, and DOES 1 through 100 were negligent in designing, manufacturing, supplying, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, warning and/or labeling JUUL's Products.

144.   Further, JLI DEFENDANTS violated California *Penal Code* § 308 "(a) It is unlawful for any person, firm, or corporation to sell, give, or in any way furnish to a minor any tobacco product or paraphernalia if that person, firm, or corporation knows or should otherwise have grounds to know that the recipient is a minor" and New York's *Penal Code* § 260.21 "It is unlawful to "3. Sell tobacco or a tobacco product to a person under the age of 18."

145.   Plaintiffs were people that JLI DEFENDANTS, ALTRIA, and DOES 1 through 100 should reasonably have expected to be affected as a result of JUUL use.

146.   JLI DEFENDANTS, ALTRIA, and DOES 1 through 100, were negligent, reckless and careless and failed to take the care and duty owed to Plaintiffs, thereby causing Plaintiffs to suffer harm.

28

147.    The negligence and extreme carelessness of JLI DEFENDANTS, ALTRIA, and DOES 1 through 100 includes, but is not limited to, the following:

Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

Failure to take reasonable care in the design of JUUL's Products;

Failure to use reasonable care in the production of JUUL's Products;

Failure to use reasonable care in the manufacture of JUUL's Products;

Failure to use reasonable care in the assembly of JUUL's Products;

Failure to use reasonable care in supplying JUUL's Products;

Failure to use reasonable care in advertising, promoting, and marketing JUUL's Products;

Promotion of JUUL to young people under age 26;

Use of flavors and design to appeal to young people under age 26, in that the products smell good, look cool and are easy to conceal from parents and teachers;

Use of design that maximizes nicotine delivery while minimizing "harshness", thereby easily creating and sustaining addiction;

Failure to prevent JUUL from being sold to young people under age 26;

Failure to prevent JUUL use among young people under age 26;

Failure to curb JUUL use among young people under age 26;

Failure to develop tools or support to help people addicted to JUUL cease using the product;

Failure to reasonably and properly test and properly analyze the testing of JUUL's Products under reasonably foreseeable circumstances;

Failure to warn or disclose to customers about the dangers associated with use of JUUL's Products, in that it was unsafe for anyone under age 26, significantly increases blood pressure, causes vascular damage, carries risks of stroke, heart attacks, and cardiovascular injuries, causes lung collapse and other pulmonary injuries, causes seizures and other neurological injuries, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

Failure to instruct customers not to use the product if they were under 26, and failing to provide any instructions regarding a safe amount of JUUL pods to consume in a day.

Failure to warn or disclose to customers that JUUL had not adequately tested or researched JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

Failure to utilize proper materials and components in the design of JUUL's Products to ensure they would not deliver unsafe doses of nicotine;

Failure to use due care under the circumstances;

Failure to take necessary steps to modify JUUL's Products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

Failure to recall JUUL's Products; and

Failure to inspect JUUL's Products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

148.	JLI DEFENDANTS, ALTRIA, and DOES 1 through 100's acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.

149.	JLI DEFENDANTS, ALTRIA, and DOES 1 through 100 acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiffs. JLI DEFENDANTS, ALTRIA, and DOES 1 through 100's acts and omissions had a great probability of causing significant harm and in fact resulted in such harm.

150.	As a result of JLI DEFENDANTS, ALTRIA, and DOES 1 through 100's negligence and/or gross negligence, Plaintiffs were harmed as described herein.

151.	JLI DEFENDANTS, ALTRIA, and DOES 1 through 100's negligence and/or gross negligence were a substantial factor in causing PLAINTIFFS' harms and losses.

152.	As a result of their injuries caused by JLI DEFENDANTS, ALTRIA, and DOES 1 through 100, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

153. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS, ALTRIA and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Negligent Failure to Recall

### (Against JLI DEFENDANTS and DOES 1-100)

154. Plaintiffs incorporate the above and below allegations by reference.

155. JLI DEFENDANTS and DOES 1 through 100 acted negligently by failing to recall the JUUL Products prior to Plaintiffs' injuries.

156. JLI DEFENDANTS, in concert with and aided by Defendants DOES 1 through 100, designed, manufactured, assembled, produced, distributed, maintained and/or sold the JUUL Products.

157. JLI DEFENDANTS and DOES 1 through 100 knew or reasonably should have known that, when used as intended, the JUUL Products presented or were likely to present a danger to users, including Plaintiffs.

158. JLI Defendants and DOES 1 through 100 became aware of this defect after the product was sold to Plaintiffs.

159. JLI Defendants and DOES 1 through 100 failed to recall JUUL Products.

160. A reasonable manufacturer, distributor, and/or seller under the same or similar circumstances would have recalled JUUL Products.

161. JLI Defendants' failure to recall JUUL Products was a substantial factor in causing Plaintiffs' harm.

162. As a result of their injuries caused by JLI DEFENDANTS and DOES 1 THROUGH 100 Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

163. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS, and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Fraudulent Misrepresentation

### (Against JLI DEFENDANTS and DOES 1-100)

164. Plaintiffs incorporate, repeat, reiterate and reallege the above and below allegations.

165. During the period of time that JLI DEFENDANTS and DOES 1 through 100 designed, manufactured, distributed, advertised, promoted, supplied and marketed the JUUL Products, they knowingly and purposely represented to the Plaintiffs, and users of JUUL Products that the products were safe, fit for their intended purposes, would function without defect, and were appropriate for use.

166. JLI DEFENDANTS and DOES 1 through 100 knew that these representations were false when made in their advertising.  The true facts that JLI DEFENDANTS and DOES 1 through 100 concealed were that the JUUL Products are dangerous and may cause long-term adverse health consequences, including injury to the lungs, brain, and cardiovascular systems.

167. When JLI DEFENDANTS and DOES 1 through 100 made these representations in their advertising, they knew that the representations were false, or made the representations recklessly and without regard for their truth. The representations were made by JLI DEFENDANTS and DOES 1 through 100  with intent to deceive the public, including teenagers and young adults, users of JUUL Products, such as the Plaintiffs, with intent to induce them to purchase and use JUUL Products.

168. The teenagers, young adults, and users of JUUL Products, including Plaintiffs, at the time these representations were made by JLI DEFENDANTS and DOES 1 through 100 and at the time the JUUL Products were purchased and used, were ignorant of the falsity of JLI DEFENDANTS' representations and believed that the JUUL Products were safe for use, safer than traditional cigarettes, not harmful like traditional cigarettes, and were fit for their intended purposes, and that JUUL Products were not dangerous and did not impose any health risks, and would function without defect.

169. Plaintiffs were people that JLI DEFENDANTS and DOES 1 through 100 should reasonably have expected to be affected as a result of JUUL use.

170. Plaintiffs reasonably relied on JLI DEFENDANTS' representations, having no independent expertise of their own to evaluate the product or the representations to be anything other than what JLI DEFENDANTS represented. Plaintiffs have suffered and will continue to suffer from physical injuries and the continuing likelihood of medical problems as described herein.

171. Plaintiffs' reliance on JLI DEFENDANTS' representations was a substantial factor in causing the harm to Plaintiffs.

172. As a result of JLI DEFENDANTS' and DOES 1 through 100 representations, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

173. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against JLI DEFENDANTS and DOES 1-100)

174. Plaintiffs incorporate, repeat, reiterate and reallege the above and below allegations.

175. During the period of time that JLI DEFENDANTS and DOES 1 through 100 designed, manufactured, distributed, advertised, promoted, supplied, and marketed the JUUL Products, JLI DEFENDANTS and DOES 1 through 100 falsely and negligently represented to the Plaintiffs, the consumer of the product, through their advertising, that the JUUL Products were safe for use, safer than traditional cigarettes, not harmful like traditional cigarettes, and were fit for their intended purposes; that JUUL Products were not dangerous and did not impose any health risks; and that the products would function without defect.

176. The representations made by JLI DEFENDANTS and DOES 1 through 100 in their advertising were false. JLI DEFENDANTS and DOES 1 through 100 concealed, falsified, or misrepresented to the public, and to medical providers the true facts, representing that the JUUL Products

are safe for use, safer than traditional cigarettes, not harmful like traditional cigarettes, and fit for their intended purposes, even though use of the JUUL Products may cause severe medical problems as described herein.

177. Plaintiffs were people that JLI DEFENDANTS and DOES 1 through 100 should reasonably have expected to be affected as a result of JUUL use.

178. When JLI DEFENDANTS and DOES 1 through 100 made these representations in their advertising, they knew or should have known that the representations were false and that they were made with no reasonable ground for believing them to be true. The representations were made by JLI DEFENDANTS and DOES 1 through 100 with intent to deceive users of the JUUL Products, and the public, with intent to induce them to use JUUL Products.

179. At the time these representations were made in their advertising, JLI DEFENDANTS and DOES 1 through 100 concealed from Plaintiffs their lack of adequate testing and research and their lack of information about the safety of the JUUL Products.

180. Plaintiffs, at the time these representations were made by JLI DEFENDANTS and DOES 1 through 100 and at the time Plaintiffs purchased and used JUUL Products, were ignorant of the falsity of JLI DEFENDANTS representations and believed that the JUUL Products were safe and fit for their intended use.

181. In reliance on JLI DEFENDANTS' and DOES 1 through 100 representations, Plaintiffs were induced to and did purchase and use JUUL Products. Had Plaintiffs known of the true facts, Plaintiffs would not have taken such actions.

182. Plaintiffs reasonably relied on JLI DEFENDANTS' and DOES 1 through 100 representations that the product was safe, having no independent expertise of his own to evaluate the product or the representations to be anything other than what JLI DEFENDANTS represented.

183. Plaintiffs have suffered and will continue to suffer from physical injuries and the continuing likelihood of medical problems as described herein.

184. Plaintiffs' reliance on JLI DEFENDANTS and DOES 1 through 100, representations was a substantial factor in causing the harm to Plaintiffs.

185.    As a result of their injuries caused by JLI DEFENDANTS and DOES 1 through 100, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

186.    As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS and DOES 1 through 100, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Fraudulent Concealment

### (Against JLI DEFENDANTS, ALTRIA, and DOES 1-100)

187.    Plaintiffs incorporate the above and below allegations by reference.

188.    DEFENDANTS had a duty to disclose material facts about JUUL Products to Plaintiffs, as:

a.    DEFENDANTS disclosed some facts to Plaintiffs about the nature and safety of its products but intentionally failed to disclose other facts, making the disclosures it did make misleading or deceptive; and

b.    DEFENDANTS intentionally failed to disclose certain facts about the nature and safety of JUUL Products that were known only to DEFENDANTS and that DEFENDANTS knew Plaintiffs could not have known or reasonably discovered.

189.    At all times relevant, DEFENDANTS fraudulently and deceptively sold or partnered to sell JUUL Products to Plaintiffs as safe or not harmful, when DEFENDANTS knew it to be untrue.

190.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally and JUUL Products in particular for young persons under age 26. At all relevant times, JLI DEFENDANTS represented its products on its website as a "smarter" choice.  JLI DEFENDANTS pitched investors by claiming that the product was not harmful, and therefore any concern about addiction was irrelevant.  DEFENDANTS worked together to pitch news stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic.  These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among

the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

191. DEFENDANTS failed to disclose to Plaintiffs that JUUL Products significantly increase blood pressure, and can cause strokes, seizures, lung collapse, and other adverse health effects.

192. DEFENDANTS failed to disclose that they had not adequately researched or tested JUUL to assess its safety before placing it on the market and promoting it to young people under age 26.

193. At all times relevant to Plaintiffs, DEFENDANTS failed to disclose that JUUL was addictive.

194. DEFENDANTS also failed to disclose to Plaintiffs that the JUUL nicotine salts purchased were highly addictive in nature, making it extremely difficult for one to cease purchasing JUULpod refills.

195. DEFENDANTS further failed to disclose to Plaintiffs that JUUL is designed to create and sustain an addiction to nicotine. DEFENDANTS also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and DEFENDANTS did so without notifying Plaintiffs. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

196. DEFENDANTS fraudulent misrepresented to users the amount of nicotine consumed by using JUUL. As previously explained, JLI DEFENDANTS claim that one JUULPod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

197. Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume JUUL Products.

198. Plaintiffs did not know of the facts that DEFENDANTS concealed.

199. DEFENDANTS intended to deceive Plaintiffs and the public by concealing these facts.

200.    DEFENDANTS had a duty to accurately provide this information to Plaintiffs.  In not so informing Plaintiffs, DEFENDANTS breached their duty.  DEFENDANTS also gained financially from, and as a result of their breach.

201.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiffs, through packaging, advertising, retail outlets, on its website, via emails to Plaintiffs, and on social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about JUUL products.

202.    Plaintiffs relied to their detriment on DEFENDANTS' fraudulent omissions. Had Plaintiffs been adequately informed of the material facts concealed from them regarding the safety of JUUL, and not intentionally deceived by DEFENDANTS, they would not have purchased or used JUUL products.

203.    As a result of their injuries caused by DEFENDANTS, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

204.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiffs' harm as described herein. They also suffered economic harm in that they would not have purchased JUUL if they had known the true facts.

205.    DEFENDANTS' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich DEFENDANTS.  DEFENDANTS' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION

### Fraud

### (Against JLI DEFENDANTS, ALTRIA, and DOES 1-100)

206.    Plaintiffs incorporate the above and below allegations by reference. Plaintiffs are informed and believe, and thereon alleges, that DEFENDANTS falsely and fraudulently represented to Plaintiffs, and members of the general public, that JUUL e-cigarettes and pods were safe for use. The representations by DEFENDANTS were in fact false. Contrary to DEFENDANTS' representations, JUUL e-cigarettes and

37

pods were not safe for use by members of the general public and were, in fact, extremely dangerous to consumers.

207. DEFENDANTS made other representations about the safety of JUUL e-cigarettes and pods, including, but not limited to, the false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions alleged herein. DEFENDANTS intentionally deceived Plaintiffs with regard to the safety of JUUL e-cigarettes.

208. DEFENDANTS intentionally misrepresented the safety of JUUL e-cigarettes and pods in their advertising, representing in that advertising that JUUL e-cigarettes and pods were safe for use, and concealed in the advertising the known risks and side effects of JUUL e-cigarettes and pods.

209. When DEFENDANTS made these representations, they knew that such representations were false. DEFENDANTS made the representations with the intent to defraud and deceive Plaintiffs, consumers, and the public in general, and with the intent to induce them to use JUUL e-cigarettes and pods in the manner alleged in this Complaint.

210. Plaintiffs took the actions alleged in this Complaint, while ignorant of the falsity of DEFENDANTS' representations in their advertising, and reasonably believed them to be true. In reliance upon such representations, Plaintiffs were induced to, and did, use JUUL e-cigarettes and pods as alleged in this Complaint. If Plaintiffs had known the actual facts, Plaintiffs would not have used JUUL e-cigarettes and pods, and their reliance upon DEFENDANTS' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

211. As alleged, DEFENDANTS worked in concert to maintain and expand the number of nicotine-addicted e-cigarette users to ensure a steady and growing customer base. DEFENDANTS sought to accomplish this objective by (1) designing a product that delivered nicotine in a manner and in doses that were intended to addict or exacerbate the nicotine addiction of its users; (2) fraudulently marketing, advertising, promoting and misbranding that potent product to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

212. DEFENDANTS took action to contribute to the conspiracy in different ways, for example:

a.        The JLI DEFENDANTS designed and continuously ratified the JUUL product design, which delivered nicotine in a manner and in doses that were intended to addict or exacerbate the nicotine addiction of its users.

b.        ALTRIA, as early as 2017, shared data and strategy with the JLI DEFENDANTS to support their common purpose, including through a conduit, Avail Vapor.

c.        Through their positions on the JLI Board of Directors, BOWEN, MONSEES, PRITZKER, HUH, and VALANI were directly responsible for the marketing, as they had "final say" over all of JLI's marketing activities, and caused false and misleading advertisements—including the Vaporized and "Make the Switch" campaign—that omitted JUUL's nicotine content to be transmitted over social media, the JLI website and other media channels.

d.        ALTRIA made a $12.8 billion equity investment in JLI, giving ALTRIA three seats on the JLI Board of Directors, furthering their concerted action and facilitating JLI's nationwide distribution of the JUUL product.

e.        ALTRIA took action to ensure JLI's products had access to prime shelf space in retail locations.

f.        ALTRIA continued this scheme by transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible cigarettes.

213.    JLI DEFENDANTS and ALTRIA's fraud and deceit was a substantial factor in causing Plaintiffs' harm as alleged herein.

214.    As a result of their injuries caused by JLI DEFENDANTS and ALTRIA Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

215.    DEFENDANTS' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich DEFENDANTS.  DEFENDANTS' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

39

## NINTH CAUSE OF ACTION

### Violation of Consumer Protection Laws[2]

### (Against JLI DEFENDANTS, ALTRIA , and DOES 1-100)

216.    Plaintiffs incorporate the above and below allegations by reference.

217.    DEFENDANTS have engaged in unlawful, unfair and fraudulent business acts and practices in violation of the Plaintiffs' applicable consumer protection laws.  DEFENDANTS' conduct violates the Plaintiffs' applicable consumer protection laws in at least the following ways:

a.    By concealing the health risks associated with JUUL products, including, but not limited to, increased blood pressure, strokes, heart attacks and other cardiovascular events, addiction, seizures and permanent brain changes, lung collapse and pulmonary injuries, mood disorders and learning and cognitive impairments;

b.    By concealing that JUUL is unsafe for anyone under age 26;

c.    By downplaying and minimizing the risks of JUUL products and promoting them as safe and not harmful;

d.    By conspiring with others in the tobacco industry to downplay and minimize the risks of e-cigarette products, create confusion and doubt in the public regarding the safety of e-cigarettes, overstate the benefits of nicotine and e-cigarette products, and undermine the public health efforts to prevent and curb use of e-cigarettes by those under age 26;

e.    By misrepresenting the delivery of nicotine as "approximately equivalent to one pack of cigarettes" when in fact, as consumed, JUUL products deliver much higher quantities of nicotine;

f.    By concealing that JUUL is designed to create and sustain addiction among young people rather to transition adult smokers from conventional cigarettes;

g.    By disseminating advertisements regarding JUUL Products that JLI DEFENDANTS, ALTRIA, DOES 1-100 knew or should have known were false, misleading or which by

---

[2] N.Y. Gen. Bus. Law §§ 349 et seq.; N.Y. Gen. Bus. Law §§ 350 et seq.; Fla. Stat. Ann. §§ 501.201 et seq.; N. H. RSA 358-A:1 et seq.; Ohio Rev. Code Ann. §§ 1345.01 et seq.; Me. Rev. Stat. Ann. tit. 5, §§ 205-A et seq.; N.J. Stat. § 56:8-1 et seq.; N.C. Gen. Stat.§§ 75-1.1 et seq.; § 407.020 R.S.Mo. et seq.;

the exercise of reasonable care should be known, to be untrue or misleading, with the intent to addict youth

and others to nicotine in order to generate profits;

h.        By knowingly and intentionally designing the JUUL device and JUUL pods in a way

that deliberately appeals to young people:

i.        Making the pods available in flavors that JUUL knew that teens would find irresistible and would not associate with tobacco or smoking;

ii.        Intentionally advertising and marketing its products in ways that make the device appear deceptively harmless, including concealing that product is highly addictive, poses long-term risks to developing brains (mood disorders, permanent impairment of impulse control, concentration and learning), significantly increases blood pressure, causes repeated exposure to toxic chemicals and can cause cardiovascular events, such as strokes and heart attacks, can cause lung collapse and other pulmonary injuries, and can cause brain injuries such as seizures;

iii.        Designing the JUUL so that it maximizes nicotine delivery, while minimizing "harshness", so as to recruit and retain young people as the next generation of customers;

iv.        Designing the JUUL device so that it is small and can easily be concealed;

v.        Designing the JUUL device so that it resembles a USB flash drive, which can be charged in the USB port of laptop, so that parents and teachers will      have trouble identifying when a young person is JUULing;

vi.        Making the smell emitted when a young person exhales indistinguishable from other common scents, so that parents and teachers will not be any the wiser; and

vii.        Promoting the JUUL device on social media sites such as Twitter and Instagram in order to appeal to the younger generation.

218.    DEFENDANTS' unlawful, unfair and fraudulent business acts and practices caused

Plaintiffs to purchase the JUUL device and/or JUUL pods.

219.    DEFENDANTS' conduct is unfair because DEFENDANTS deceive and mislead consumers

by inducing young persons under age 26 to purchase a product that is unsafe for them, delivers high amounts

of nicotine, is incredibly addictive, causes repeated exposure to toxic chemicals, carries risks of seizures

and other brain injury events, strokes and other cardiovascular injuries, lung collapse and other pulmonary

injuries, and has no benefit to them, while making it appear that the product is harmless.  DEFENDANTS

were and are aware that young persons are unable to appreciate the risk of JUULing to their health and

welfare, and that many young people do not even know that the product always contains nicotine, is

41

addictive, or unsafe for them in any amount.  In this way, DEFENDANTS unfairly target young persons in order to get customers for life.

220.    DEFENDANTS' business practices are also fraudulent because DEFENDANTS deceptively sell JUUL products to Plaintiffs as harmless, and a "safer" alternative to cigarettes, while concealing that JUUL is unsafe for anyone under age 26, delivers a more potent dose of nicotine than conventional cigarettes, is highly addictive, significantly increases blood pressure, and can cause strokes, heart attacks, seizures, lung collapse, and other deleterious effects.

221.    DEFENDANTS' misrepresentations and omissions as alleged herein were consistent with and part of its scheme to lure young persons into becoming customers for life and to maximize profits at the expense of public health.

222.    Accordingly, Plaintiffs have suffered injury in fact including lost money as a result of Defendants' unlawful, unfair and fraudulent business practices.

223.    Plaintiffs seek to enjoin further unlawful, unfair and fraudulent acts or practices by DEFENDANTS under Plaintiffs' applicable consumer protection laws.

224.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin DEFENDANTS from continuing their unfair and deceptive practices and to restore to Plaintiffs any money it acquired by unfair competition, including restitution and/or disgorgement, as provided in Plaintiffs' applicable consumer protection laws and for such other relief set forth below.

225.    DEFENDANTS' conduct, as described herein, is unfair because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.  Under the auspices of creating an alternative for adult cigarette smokers, DEFENDANTS developed a highly addictive and dangerous product and marketed it to young people as cool, fun, and harmless.  Their scheme worked, attracting millions and millions of teens, including Plaintiffs, who have become powerfully addicted to their product and have been exposed to massive amounts of nicotine and other toxic chemicals.  As a result of DEFENDANTS' conduct, Plaintiffs suffered harms as described herein, and others are at risk of the same or similar injuries. DEFENDANTS created this epidemic and bear responsibility for its consequences.

226. The gravity of the harm resulting from DEFENDANTS' conduct far outweighs any conceivable utility of this conduct. There are reasonably available alternatives that would further DEFENDANTS' legitimate business interests in offering an alternative to adult cigarette smokers over age 26, including, but not limited to: using only tobacco flavoring, designing the products to deliver far less nicotine—only as much as would be sufficient to attract a nicotine-addicted cigarette smoker—so as to reduce the nicotine-related harms and reduce the exposure to other toxic chemicals, and offering the products "behind the counter" at pharmacies. Instead, DEFENDANTS used kid-friendly flavors and design, promoted the products as harmless and cool, conspired with others in the industry to downplay the risks and inflate the benefits, and has done nothing to curb or prevent young people from starting and continuing to use its products, despite the known risks of harm.

227. Plaintiffs could not have reasonably avoided injury from DEFENDANTS' unfair conduct. Plaintiffs did not know, and had no reasonable means of learning, that JUUL could harm them as it did. Nor did Plaintiffs know that JUUL had been designed to lure and trap them into becoming a customer for life.

228. Plaintiffs were harmed, and DEFENDANTS' misleading statements and omissions were a substantial factor in causing Plaintiffs' harm.

229. The requested injunction under the UCL will primarily benefit the interests of the general public. It will have the primary purpose and effect of prohibiting acts that threaten injury to members of the public who have or will be exposed to JUUL's conduct.

## TENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### (Against JLI DEFENDANTS)

230. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

231. At all relevant times, JLI DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold

and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiffs.

232.    JLI DEFENDANTS at all times were merchants with respect to JUUL Products sold to Plaintiffs and were in the business of selling such products.

233.    Each JUUL Product sold comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

234.    The ordinary intended purposes of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes or a smoking cessation device. For example, the "Make the Switch" campaign reinforces the impression that JUUL is linked to cessation and quitting and that JUUL is less harmful to one's health.

235.    JUUL's products are not fit for that use—or any other use—because they are an unreasonably potent nicotine-delivery mechanism, contain nicotine levels higher than "approximately equivalent to a pack of cigarettes" in contrast to their warranties, and pose significant risks of substantial physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, JUUL Products worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction, JUUL Products have served as a gateway to increased cigarette use.

236.    Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices and JUUL Products are in fact defective and fail to conform to JUUL's implied warranties.

237.    The JLI DEFENDANTS have breached JUUL's implied warranty of merchantability because JUUL Products were not in merchantable condition when sold, were defective when sold, and do not possess even the most basic degree of fitness for ordinary use.

238.    Despite having received notice of these defects, the JLI DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

239.    Plaintiffs have had sufficient direct dealings with the JLI DEFENDANTS via its website to establish privity of contract between JLI.

44

240. Further, Plaintiffs were third-party beneficiaries of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL Products to consumers. Specifically, Plaintiffs are the intended beneficiaries of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

241. Plaintiffs would not have used or purchased JUUL Products, or would not have purchased the products on the same terms, had they known the facts these Defendants failed to disclose.

242. JLI DEFENDANTS' breach of these warranties was a substantial factor in causing Plaintiffs' harms.

243. Plaintiffs were injured as a direct and proximate result of JLI DEFENDANTS' breach of implied warranties of merchantability. Plaintiffs have been harmed by DEFENDANTS' failure to delivery merchantable products. The products were not in merchantable condition and were unfit because, in ordinary use, they create higher-than-perceived nicotine exposure, addiction, and other negative health consequences.

244. As a result of their injuries caused by JLI DEFENDANTS, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

245. As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of JLI DEFENDANTS, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**

**Aiding and Abetting**

**(Against JLI MANAGEMENT and ALTRIA)**

246. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

247. JLI MANAGEMENT and ALTRIA knew that JLI was defrauding Plaintiffs by, *inter alia*, leading the public to believe that: (1) JUUL is a safe device; (2) that JUUL is safer than cigarettes; and (3) that JUUL is a smoking cessation device.

248.    ALTRIA gave substantial assistance to JLI in its perpetration of fraud by, *inter alia*, sharing flavoring and sales data/strategy to effectively target youth, providing access to prime shelf space in retail locations, expanding JLI's distribution capacity and stymieing regulation of JLI's products through deception.

249.    JLI MANAGEMENT gave substantial assistance and encouragement to JLI in its perpetration of fraud by, *inter alia*, supplying false and misleading statements to regulators and entering into an ongoing conspiracy to defraud with ALTRIA.

250.    ALTRIA and JLI MANAGEMENT'S conduct was a substantial factor in causing harm to Plaintiffs.

251.    As a result of their injuries caused by ALTRIA and JLI MANAGEMENT, Plaintiffs have incurred and will incur significant medical expenses, pain and suffering, and emotional distress.

252.    As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of ALTRIA and JLI MANAGEMENT, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

## PUNITIVE DAMAGES ALLEGATIONS

253.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

254.    Through the actions outlined above, DEFENDANTS expressed a reckless indifference to the safety of users of JUUL e-cigarettes and pods, including Plaintiffs. DEFENDANTS' conduct, as described herein, knowing the dangers and risks of JUUL e-cigarettes and pods, yet concealing and/or omitting this information in their advertising, in furtherance of their conspiracy and concerted action was outrageous because of DEFENDANTS' evil motive or a reckless indifference to the safety of users of JUUL e-cigarettes and pods, including Plaintiffs.

255.    Plaintiffs are entitled to punitive damages because DEFENDANTS' failure to warn and other actions as described herein were malicious, wanton, willful or oppressive or were done with reckless indifference to the Plaintiffs' and the public's safety and welfare.  DEFENDANTS misled both the FDA and the public at large, including the Plaintiffs herein, by making false representations about the safety of

their product.  In their advertising, DEFENDANTS downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects associated with the use of their product, despite available information demonstrating that JUUL e-cigarettes and pods were likely to cause serious side effects.

256.    DEFENDANTS were or should have been in possession of evidence demonstrating that their products caused serious side effects.  Nonetheless, they continued to advertise the products by providing false and misleading information with regard to safety and efficacy.

257.    DEFENDANTS, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing DEFENDANTS' profits, knowingly and deliberately failed to remedy the known defects in the JUUL e-cigarettes and pods products, and failed to warn the public, including the Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in the JUUL e-cigarette and pods products. DEFENDANTS and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the JUUL e-cigarette and pods products knowing that the public, including Plaintiffs, would be exposed to serious danger in order to advance DEFENDANTS' own pecuniary interest and monetary profits.

258.    DEFENDANTS' actions described above were performed willfully, intentionally and with reckless disregard for the rights of Plaintiffs and the public.

259.    As a direct and proximate result of the willful, wanton, evilly, motivated and/or reckless conduct of DEFENDANTS, Plaintiffs sustained damages as set forth above. Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at trial.

### TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

260.    DEFENDANTS failed to disclose a known defect and affirmatively misrepresented that JUUL e-cigarettes and pods were safe for their intended use in their advertising.  Further, in their advertising, DEFENDANTS actively concealed the true risks associated with the use of JUUL e-cigarettes and pods.  Plaintiffs had no knowledge that DEFENDANTS were engaged in the wrongdoing alleged herein. Because of DEFENDANTS' concealment of and misrepresentations regarding the true risks

associated with JUUL e-cigarettes and pods, Plaintiffs could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

261. Thus, because Defendants fraudulently concealed the defective nature of JUUL e-cigarettes and pods and the risks associated with their use, the running of any statute of limitations has been tolled.

262. Additionally, and alternatively, Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that JUUL e-cigarettes and pods caused the appreciable harm sustained by Plaintiffs. Plaintiffs did not have actual or constructive knowledge of the existence of all facts or causes of action indicating to a reasonable person that Plaintiffs were the victim of a tort. Plaintiffs were unaware of the facts upon which a cause of action rests until less than the applicable limitations period prior to the filing of this action. Plaintiffs' lack of knowledge was not willful, negligent, or unreasonable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiffs for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

3. Awarding Plaintiffs reasonable attorneys' fees;

4. Awarding Plaintiffs the costs of these proceedings; and

5.      Such other and further relief as this Court deems just and proper.


Dated: New York, New York
       October 28th, 2022


                              **DOUGLAS & LONDON, P.C.**


                              By: _____
                              MICHAEL A. LONDON (ML-7510)
                              59 Maiden Lane, 6th fl
                              New York, New York 10038
                              Ph:  (212) 566-7500
                              Fax: (212) 566-7501
                              Email: mlondon@douglasandlondon.com

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

_____
MICHAEL A. LONDON (ML-7510)